## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FOREST GUARDIANS, FOREST
CONSERVATION COUNCIL, [and]
KATHRYN GALLAGHER,

        Plaintiffs,

vs.                                                                                 No.  CV 00-714 JP/KPM-ACE

UNITED STATES FOREST SERVICE,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiffs' Olenhouse Motion for Reversal of Decision to Authorize the McGaffey Timber Sale on the Cibola National Forest was filed March 12, 2001, [Doc. No. 18].[1]  The Court, having carefully read the briefs and the administrative record, and having considered the applicable law, concludes that the motion should be granted.

**I.**      **BACKGROUND**

Plaintiffs are an individual and two non-profit organizations that promote, inter alia, the protection and restoration of intact forest ecosystems and the native biological diversity of forests. Plaintiffs request that the Court reverse Defendant United States Forest Service's administrative decision to authorize the McGaffey Timber Sale in the Cibola National Forest.  The McGaffey Timber Sale area is located within the northwest corner of the Zuni Mountain Unit of the Mt. Taylor Ranger District.  It is approximately fifteen miles southeast of Gallup, New Mexico, and consists of approximately 13,336 acres.

---

[1] Defendant filed its response brief on May 21, 2001, and Plaintiffs filed their reply brief on July 23, 2001.  Although styled as a motion for reversal, Plaintiffs' challenge to Defendant's agency action will be treated as an appellate brief on the merits. Olenhouse v. Commodity Credit Corp., 42 F.3d 1560, 1579-80 (10th Cir. 1994).

In 1985, the Forest Service adopted the Cibola National Forest Land and Resource Management Plan (Forest Plan).[2]  The Forest Plan was completed after several years of internal study and public participation and included the preparation of an Environmental Impact Statement (EIS) in accordance with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 et seq. In the Forest Plan, the Forest Service selected management indicator species for the Cibola National Forest and adopted monitoring obligations for these species.[3]  Management indicator species, also known as MIS, are those species used as a "bellwether" for "the other species that have the same special habitat needs or population characteristics." Inland Empire Pub. Lands Council v. United States Forest Serv., 88 F.3d 754, 762 n.11 (9th Cir. 1996); see 36 C.F.R. § 219.19(a)(1).  The requirement that the Forest Service choose management indicator species "is intended to allow the Service to thoroughly evaluate the effects of [proposed management activity alternatives] on fish and wildlife populations by using a 'class representative,' without having to evaluate each species individually." Island Empire, 88 F.3d at 762 n.11; see 36 C.F.R. § 219.19(a)(1).

In 1991, the Forest Service began planning for the McGaffey Timber Sale project.  Five of the Forest Plan's eleven or twelve management indicator species were selected by the Forest

---

[2] Unfortunately, only slivers of the Forest Plan are included in the Administrative Record (AR).

[3] Plaintiffs allege in their Olenhouse brief that the Forest Service designated fifteen management indicator species in the Forest Plan.  The basis of this number is unknown.  In their Amended Complaint, Plaintiffs list eleven management indicator species.  Although the Forest Service lists twelve "incidator [sic] species" in its Forest Plan, AR 2 at 68-3, it lists eleven species in its 1985 Forest Plan EIS, AR 1 at 90-91 (Table 17), 123 (Table 42).  In 1990, the black bear was added to the list of management indicator species.  AR 100 at 31.  In 1991, the Forest Plan was amended to add the grasshopper sparrow.  Id.  Thirteen management indicator species are listed in the Forest Service's Fiscal Year 1998 Annual Monitoring and Evaluation Report for the Cibola National Forest and National Grasslands.  AR 166 at 4.  The black bear and grasshopper sparrow are not included in this 1998 listing.  Id.

Service to be included in the McGaffey project analysis as inhabitants of the project area. These five species are three "game" animals (mule deer, elk, and Merriam's turkey) and two "nongame" birds (plain titmouse and house wren). The Forest Service developed four alternative project approaches and through internal study and public comment evaluated the detrimental and beneficial effects of each alternative. In early 1997, an additional project alternative was included in the project analysis. In the fall of 1997, the Forest Service issued an Environmental Assessment (EA) for the project. In late 1997, after a public comment period, the Acting Forest Supervisor issued a McGaffey Timber Sale Decision Notice with a Finding of No Significant Impact (FONSI).[4] In his decision, the Acting Forest Supervisor selected one of the "action" project alternatives and approved proceeding with a timber sale. The Acting Forest Supervisor's decision was successfully administratively appealed, resulting in the reversal of the decision in 1998.

In July 1999, after additional internal study and public comment, the Forest Service issued a new EA for the McGaffey Timber Sale. In January 2000, after allowing for public comment on the EA, the Forest Supervisor issued a McGaffey Timber Sale Decision Notice with a FONSI. The Forest Supervisor, while selecting a project alternative different from the one chosen in the Forest Service's previous project decision, again approved proceeding with a timber sale. In February 2000, two separate administrative appeals were filed. The appellants included the present Plaintiffs. In April 2000, the Forest Supervisor's decision was affirmed by the Forest Service's Appeal Deciding Officer.

In May 2000, Plaintiffs brought this action under 28 U.S.C. § 1331 (federal question

---

[4] The Acting Forest Supervisor's issuance of a FONSI meant that no EIS was required under NEPA for the McGaffey Timber Sale project.

jurisdiction); the Administrative Procedures Act (APA), 5 U.S.C. § 701 et seq.; and the Freedom of Information Act (FOIA), 5 U.S.C. § 552(a)(4)(B).[5] Plaintiffs contend that in analyzing the effects of the McGaffey Timber Sale on the area's management indicator species, the Forest Service violated the National Forest Management Act, 16 U.S.C. § 1604; the Act's implementing regulations, 36 C.F.R. § 219[6]; and the Cibola Forest Plan.[7] The relief Plaintiffs seek includes: a judicial declaration that the Forest Service's decision to proceed with the McGaffey Timber Sale violates the National Forest Management Act and the APA; an order requiring the Forest Service to withdraw its decision; an order requiring the Forest Service to bring itself into compliance with the National Forest Management Act, the Act's implementing regulations, and the Forest Plan; and any necessary interim injunctive relief.

## II. DISCUSSION

### A. Standard of Review

Review of the Forest Service's final decision is governed by the APA, 5 U.S.C.

---

[5] In their FOIA claim, Plaintiffs allege that the Forest Service failed to respond to their formal request for information within the statutorily allotted time period. This Memorandum Opinion and Order does not address this claim.

[6] The McGaffey Timber Sale was planned in accordance with the 1982 regulations. The 1982 regulations were superceded in 2000. 65 Fed. Reg. 67,514 (Nov. 9, 2000). The 2000 regulations significantly amend the 1982 regulations, in part by omitting language of the 1982 regulations that is at issue in this case. See, e.g., 36 C.F.R. § 219.11 (2001); 64 Fed. Reg. 54,074, 54,088 (Oct. 5, 1999). However, the date of compliance with the 2000 regulations has been extended until 2002 by an interim final rule and it is possible that the 2000 regulations will be further amended. 66 Fed. Reg. 27,552-27,553 (May 17, 2001). The Court will apply the 1982 regulations because they were the regulations in effect when the challenged decision was made.

[7] Plaintiffs contend in their Amended Complaint that the Forest Service failed to designate an aquatic species as a management indicator species for the Cibola National Forest. I will not consider this contention because it was not raised in the Olenhouse briefs.

§ 706(2)(A).  Colorado Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1167 (10th Cir. 1999).  In reviewing the challenged decision, the Court must determine whether "it was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  Id. (internal quotation marks omitted).  Agency action will be set aside if "the agency . . . relied on factors which Congress had not intended for it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise."  Id. (internal quotation marks omitted; omission in Dombeck).  An agency's interpretation of its own regulations is entitled to great deference unless the interpretation is "unreasonable, plainly erroneous, or inconsistent with the regulation's plain meaning."  Bar MK Ranches v. Yuetter, 994 F.2d 735, 738 (10th Cir. 1993).

**B.  Relevant Legal Authority**

The Forest Service's regulation of the National Forests is governed by the National Forest Management Act, 16 U.S.C. § 1600 et seq., and the Act's implementing regulations, 36 C.F.R. § 219.  The Forest Service's management of the National Forests, including the Cibola National Forest, occurs at two levels.  "At the first level, the Forest Service develops the Forest Plan, a broad, programmatic document, accompanied by an [EIS] and public review process conducted in accordance with [NEPA]."  Dombeck, 185 F.3d at 1167-68; see 16 U.S.C. § 1604(d); 36 C.F.R. § 219.10(b).  The Forest Plan must incorporate the "multiple use" and "sustained yield" principles of the National Forest Management Act, including providing for biodiversity and the maintenance of native animal populations.  Dombeck, 185 F.3d at 1167-68; see 16 U.S.C. § 1604(e)(1), (g)(3)(B), (g)(3)(C); 36 C.F.R. §§ 219.19, 219.26.  A Forest Plan must be revised every ten to

fifteen years and whenever the Forest Supervisor "determines that conditions or demands in the area covered by the plan have changed significantly or when changes in . . . policies, goals, or objectives would have a significant effect on forest level programs."  36 C.F.R. § 219.10(g).  "At the second level, the Forest Service implements the Forest Plan by approving (with or without modification) or disapproving particular projects," such as the McGaffey Timber Sale.  Dombeck, 185 F.3d at 1168.  Each project proposal is subject to further NEPA review and the "[p]roposed projects must be consistent with the Forest Plan."  Id.; see 16 U.S.C. § 1604(i); 36 C.F.R. § 219.10(e).

The regulations implementing the National Forest Management Act provide that certain species will be selected as management indicator species "because their population changes are believed to indicate the effects of management activities."  36 C.F.R. § 219.19(a)(1).  The regulations require that "[p]opulation trends of the management indicator species . . . be monitored and relationships to habitat changes determined."  Id. § 219.19(a)(6).  Furthermore, "[i]nventories shall include quantitative data making possible the evaluation of diversity in terms of its prior and present conditions."  Id. § 219.26; see id. § 219.12(d) (Forest Supervisor must "obtain and keep current inventory data appropriate for planning and managing" resources within area covered by Forest Plan); cf. 16 U.S.C. § 1604(f)(3) (plan must be based upon inventories of applicable resources), (g)(2)(B) (regulations will specify guidelines which provide for obtaining inventory data), (g)(3)(C) (regulations will specify guidelines for developed plans to insure evaluation, based on continuous monitoring and assessment in the field, of effects of management systems).  Additionally, the Forest Service must evaluate planning alternatives for projects that affect the selected management indicator species "in terms of both amount and quality of habitat and of

animal population trends of the management indicator species." 36 C.F.R. § 219.19(a)(2).

The Cibola Forest Plan also obligates the Forest Service to monitor the "[p]opulation and habitat trends of management indicator species." Administrative R. (AR) 2 at 210; see 36 C.F.R. § 219.11(d) (A Forest Plan must contain "[m]onitoring and evaluation requirements that will provide a basis for periodic determination and evaluation of the effects of management practices."). Monitoring methods and intervals (both frequency and reporting) are established in the Forest Plan. For nongame birds, the monitoring methods are "point-counting," "management guilds," "single season," and habitat trends. AR 2 at 210. Game animals are to be monitored using "State Game and Fish census techniques and resultant data" and habitat trends. Id. at 211. The purpose of the "monitoring of habitat and populations [is] to ensure the species do not fall below minimum viable populations." Id. at 212.

**C.      Legal Duties**

Plaintiffs contend that the decision to proceed with the McGaffey Timber Sale violates the National Forest Management Act, the Act's implementing regulations, and the Cibola Forest Plan because it was made in the absence of relevant management indicator species population data. Plaintiffs contend that rather than conducting required population surveys and otherwise monitoring population trends for management indicator species, the Forest Service used habitat trend modeling as a proxy for actual population surveys. Plaintiffs further criticize as outdated and incomplete the computer habitat model used by the Forest Service.

1.  National Forest Management Act and Implementing Regulations

The Forest Service contends that it is not required by the National Forest Management Act or the Act's implementing regulations to collect population data for management indicator species

for site-specific projects. Rather, the Forest Service argues, the mandate applies only to the establishment of Forest Plans. The Forest Service also argues that it has "monitored population and habitat trends for [the Cibola Forest's management indicator species] at the forest level." Def.'s Resp. at 2. Finally, the Forest Service contends that its "choice of methodology on the complex science of determining population trends is entitled to great deference," id. at 17, and that it may manage management indicator species "through an analysis of project habitat effects," id. at 16.

While the implementing regulations technically apply to the "formulation of Forest Plans rather than to specific projects proposed under already enacted Forest Plans," the Forest Service's obligations under the Forest Plan "continue throughout the Plan's existence." Sierra Club v. Martin, 168 F.3d 1, 6 (11th Cir. 1999) (citing 36 C.F.R. § 219); see Island Empire Pub. Lands Council v. United States Forest Serv., 88 F.3d 754, 760 n.6 (9th Cir. 1996) (rejecting proposition that 36 C.F.R. § 219.19 applies only to promulgation and management of forest plans and not to site-specific projects, reasoning that areas contained within National Forest boundaries would be covered by a forest plan and thus also would be governed by § 219.19). The Forest Service must constantly monitor the Forest Plan's impact, including the impact of specific management actions, on the forest environment so that compliance with the Forest Plan is achieved and any needed revisions to the Forest Plan are ascertained. Martin,168 F.3d at 6; see AR 207 at 12 (1999 Annual Monitoring Report) ("There is a need to monitor for adaptive management, so changes can be made in on-going programs/projects as soon as potential problems are seen."); 16 U.S.C. § 1604(i) (site-specific management actions implemented by the Forest Service "must be consistent with the Forest Plan"); Dombeck, 185 F.3d at 1168 ("[P]roposed projects must be consistent with the

8

Forest Plan."). As the Forest Service itself explains, "[e]ffects upon <u>each MIS occurring within a proposed project area</u> [are] evaluated in <u>individual site-specific</u> EAs." AR 100 at 33 (emphases added). Therefore, to avoid an absurd result, I conclude the National Forest Management Act and the implementing regulations at issue apply to site-specific projects.

As both parties point out, there is a divergence of judicial opinion as to whether the National Forest Management Act and its implementing regulations require the Forest Service to acquire actual population data for management indicator species in evaluating proposed project alternatives or whether habitat trend analysis is sufficient.[8] The Ninth Circuit has concluded the Forest Service complied with 36 C.F.R. § 219.19(a)(2) "when it estimated the effects of the alternatives on the population of the management indicator species by analyzing the amount of the species' habitat that would be reduced by each alternative." <u>Inland Empire Pub. Lands Council v. United States Forest Serv.</u>, 88 F.3d 754, 763 (9th Cir. 1996). The Ninth Circuit further concluded that the Forest Service satisfied its obligations under § 219.19(a)(6). As a basis for this second conclusion, the court noted that the management indicator species at issue, the pileated woodpecker, had been found specifically by the Forest Service to be a reclusive species, for which "there is no technically reliable and cost-effective method of counting individual members of the species." <u>Id.</u> at 763 n.12. Consequently, "[i]n light of the Service's alternative method of population trend analysis, its failure to monitor the actual population of the pileated woodpecker is not dispositive or unreasonable." <u>Id.</u>

The Eleventh Circuit differed from the Ninth Circuit's ruling in <u>Island Empire</u> by

---

[8] For a discussion of the split in judicial interpretation of § 219.19 and of the new regulations, see Andrew Orlemann, Note, <u>Do the Proposed Forest Service Regulations Protect Biodiversity? An Analysis of the Continuing Viability of "Habitat Viability Analysis"</u>, 20 J. Land Resources & Envtl. L. 357 (2000).

concluding that the Forest Service had an obligation under § 219 to collect population data, not just habitat trend data, for management indicator species. Sierra Club v. Martin, 168 F.3d 1, 6-7 (11th Cir. 1999). The Eleventh Circuit reasoned that "the clear language of the regulations . . . requires evaluation of 'both amount and quality of habitat and of animal population trends of management indicator species,'" id. at 7 n.10 (quoting 36 C.F.R. § 219.19(a)(2) (emphasis in Martin omitted)), and that without management indicator species population data the Forest Service "cannot reliably gauge the impact of [its] timber projects on these species," id. at 7. The Eleventh Circuit also noted that Island Empire was factually distinguishable. Id. at 7 n.10 ("In that case, the Forest Service had conducted a site-specific EIS and detailed field studies before concluding that the MIS would not be significantly harmed.").

The Tenth Circuit has not decided whether the National Forest Management Act's implementing regulations require population inventories for management indicator species. Colorado Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1170 (10th Cir. 1999) (declining to comment on the "soundness of those opinions requiring population inventories . . . under very different facts and forest planning contexts"). The rationale of Dombeck, however, supports Plaintiffs' argument that § 219.19 requires population inventories and that habitat trend data may not be used as a proxy for population inventories.

In Dombeck, the Tenth Circuit concluded that the Forest Service was not required by regulatory language to collect actual population data for the species involved, the lynx, before making the challenged decision. Id. at 1169. The Tenth Circuit reasoned that Congress did not intend the Forest Service to have to collect hard population data for a species which had no known population in the area at issue. Id. The Tenth Circuit then proceeded to distinguish the case

10

before it from other decisions, including Martin, that "have read 36 C.F.R. § 219.19 to prohibit reliance on habitat analysis without hard population data":

> [T]hose decisions are distinguishable from this case in at least two important ways: (1) they involved the application of § 219.19 under circumstances in which population data was available; and (2) they involved the provisions of § 219.19 applicable to the use of a Management Indicator Species as a proxy for determining the effects of management activities on other species. As discussed above, there's simply no lynx population data available to the Forest Service in this case. Moreover, when considering the Category III expansion, the Forest Service logically did not select the rare and elusive lynx as a Management Indicator Species. Thus, the population inventory requirements of § 219.19 that apply to Management Indicator Species are irrelevant to the issue before us.

Id. at 1170 (internal citations omitted).[9]

      The Court concludes that under the facts of this case the Forest Service is obligated by the plain language of the National Forest Management Act's implementing regulations to acquire and analyze hard population data of its selected management indicator species for the McGaffey Timber Sale. Under this clear language, it may not rely solely on habitat trend data as a proxy for population data or to extrapolate population trends. Moreover, as indicated in Dombeck, management indicator species represent a management short-cut – they are those species selected for their bellwether characteristics and whose populations generally can be quantitatively ascertained and monitored. AR 100 at 30 (The Forest Plan made a "determination of management indicator species that could be monitored for effects of management activities to meet the

---

[9] The Tenth Circuit cited Inland Empire for the proposition that the Forest Service may fulfill its obligations under § 219.19 as to sensitive species through techniques other than population data if the chosen analysis "'uses all the scientific data currently available.'" Dombeck, 185 F.3d at 1169-70 (quoting Inland Empire, 88 F.3d at 762).

11

requirements of the National Forest Management Act.").[10] Consequently, there is generally no reason to further short-cut the management monitoring process by relying only on habitat trends to project management indicator species population data. Therefore, that the Forest Service was obligated as a matter of law to acquire and analyze population data (both actual and trend) for the five management indicator species in the McGaffey Sale project area before rendering a decision on the project.

2.  Cibola Forest Plan

Plaintiffs also contend that the Forest Service's decision to proceed with the McGaffey Timber Sale violates the Forest Plan because it was made in the absence of relevant management indicator species population data. The Forest Service does not appear to contest that it was obligated under the Forest Plan to assess and monitor the population, as well as habitat, trends of the Forest Plan's management indicator species.

**D.     Factual Issues**

Having established that the Forest Service was required to monitor population trends for the five management indicator species in the McGaffey Timber Sale project area, the next issue is whether the Forest Service in fact fulfilled those obligations. Although Plaintiffs contend that the Forest Service did not actually acquire and evaluate the requisite population trend data, the Forest Service argues it did comply with the habitat and population monitoring requirements of the Forest Plan and the National Forest Management Act's implementing regulations, as evidenced by its yearly monitoring reports summarizing management indicator species trends, annual bird surveys,

---

[10] Unlike the case of the pileated woodpecker in Inland Empire, the Forest Service is not claiming here that any of the relevant management indicator species are reclusive, rare, or otherwise impractical to survey. It seems inappropriate to select an elusive or reclusive species as a management indicator species.

and population data for game species received from the New Mexico Department of Game and Fish.  The Forest Service further contends that its biologist identified the existing condition of management indicator species in the project area and reported on potential issues and effects of the project on these species.  Additionally, the Forest Service argues that in its 1999 EA it reviewed the implications of the McGaffey Timber Sale on each of the five management indicator species in the proposed sale area and concluded that the project would either have no effect or a beneficial effect on each of the five species. According to the Forest Service, the needs of each of the five management indicator species and the potential impact on each species of each of the project's alternatives was also discussed in the project's 1999 EA and in the Forest Service's analysis of the public comments to the 1999 EA it was specifically noted that "while some MIS species [sic] might not be benefitted, . . . none would experience a significant decline in habitat quality," AR 203, unnumbered Attach. 1 at 3 (Decision Notice and FONSI-Analysis of Public Comment in response to 1999 EA).

   The Forest Plan provides that the population monitoring method for management indicator species which are game animals is "respective State Game and Fish census techniques and resultant data," with the data to be reviewed annually.  AR 2 at 211.  No state Game and Fish Department census data is included in the Administrative Record, either as a separate document or by incorporation or reference in another document pertaining to management indicator species.  Beyond the assumption that the Forest Service reviewed Game and Fish Department data in compiling its reports on the Zuni Mountains area's mule deer, elk, and Merriam's turkey populations, there is a paucity of evidence that information of this nature was acquired and/or reviewed for these species in the challenged project area.

The Forest Plan sets out specific methods and intervals for monitoring population trends for nongame bird management indicator species. Id. at 210-11.  Although the Court could not tell whether these monitoring requirements were specifically met, unquestionably Cibola Forest Breeding Bird Survey Reports were prepared for the Forest Service annually from 1993 through 1999.  AR 10 (1993), 12 (1994), 98 (1995), 101 (1996), 139 (1997), 165 (1998), 197 (1999).  The reports appear to be quite detailed and are notable for their emphasis on the importance of hard population data, e.g. AR 10 at 1-2; AR 12 at 1; AR 98 at 1, 2; AR 101 at 1; AR 139 at 1.  Although many of the reports contain Zuni Mountains population data for the plain titmouse (e.g., AR 12 at 21, AR 98 at 10, AR 101 at 13, AR 139 at 20, AR 165 at 29, AR 197 at 30) and the house wren (e.g., AR 10 at 13, AR 12 at 3, AR 98 at 4, AR 101 at 8, AR 139 at 15, AR 165 at 24, AR 197 at 25), the Court could not ascertain whether the population surveys for these species were performed within the McGaffey analysis area.  More importantly, there is no evidence that data from these reports was considered by the Forest Service in its determination whether to proceed with the proposed McGaffey Timber Sale.  As noted below, the bird survey data is not included or referenced in the Forest Service's biologist reports, Monitoring Reports, or 1999 EA on the issue of management indicator species.

The reports of the Forest Service's biologist on the impacts of each of the McGaffey project alternatives provide little, if any, population data for the project area's management indicator species.  The vast majority of the data provided is habitat trend analysis.  E.g., AR 85, 169.  Some nonspecific population information is provided for elk (e.g., AR 44 at 1 ("A few elk use the [analysis area].")) and Merriam's turkey (e.g., AR 85 at unnumbered 7 ("Turkey populations in the [analysis area] are moderately high.")).  Mule deer are discussed consistently in

14

the reports, but no quantitative data is provided.  As for the plain titmouse and house wren, only the last report mentions them by name and it provides only habitat information.  AR 169 at unnumbered 3-4.  Furthermore, while the source of population data, as well as survey information, for threatened, endangered, or sensitive species is clearly delineated in some of the biologist reports, e.g., AR 121 at unnumbered 8, this information is not provided for management indicator species.  The biologist reports also do not reference or otherwise explicitly incorporate management indicator species population data from relevant bird survey reports, state Game and Fish Department game animal census reports, or other survey/inventory reports.

The Forest Service's Monitoring Reports contain little or no hard population data.  Rather, like the biologist reports, they contain descriptive or conclusory statements about the Forest Plan's management indicator species, with no formal references to population analysis or inventory reports.  The Forest Plan Five Year Evaluation and Monitoring Report for Fiscal Years 1991-1995 states: "Effects upon each MIS occurring within a proposed project area is [sic] evaluated in individual site-specific EAs.  Population and habitat trends are discussed and considered for those species listed for each Management Area involved in the project proposal. Summarizing the results of all these EAs for MIS would be meaningless except to report that no population or habitats [sic] trends have been located in a downward trend.  All projects are designed to improve or enhance habitat conditions for MIS."  AR 100 at 33.

The Monitoring and Evaluation Report for Fiscal Year 1996, which is dated November 1997, reports for the five management indicator species present in the McGaffey Timber Sale area that: (1) mule deer populations are slightly depressed in the Zuni Mountains Division and are low but stable in the Mt. Taylor Division, with a joint study in 1998/1999 proposed to determine

15

factors that appear to be keeping the populations depressed; (2) elk populations are stable to slowly increasing in the Zuni Mountains Division; (3) "turkey" populations are stable in the Zuni Mountains; (4) plain titmouse "trend for occurrence due to good habitat is probably stable;" but the "population trend is unknown and not within total control of the Forest"; and (5) house wren "trend for occurrence of good quality habitat is rising with the gradual improvement of many riparian areas on the Forest;" but, "the population trend is unknown and is not within total control of the Forest."  AR 146 at 5.  The Fiscal Year 1997 Annual Monitoring Report repeats verbatim the information provided in the 1996 Report.  AR 152 at unnumbered 5.

      The Fiscal Year 1998 Annual Monitoring and Evaluation Report first presents information regarding management indicator species' population and habitat trends in a table format.  AR 166 at 4.  The table lists thirteen management indicator species, including the five management indicator species at issue in this case, and provides a column for "Population Trend" and a column for "Habitat Trend" for each of the management indicator species listed.  Id.  The population trend for the mule deer is described as "steadily upward on all mountain units except Mt. Taylor . . . "; for elk as "steadily upward"; for Merriam's turkey as "stable to upward"; for the plain titmouse as "stable;" and for the house wren as "slightly upward."  Id.  The habitat trends for these five species echoes the population trend information.  Id.  In a subsequent section, the 1998 report sets forth summary information regarding the mule deer populations ("On the Zuni Mountains, populations are rebounding somewhat . . . .") and elk populations ("The population in the Zuni Mountains is slowly increasing . . . ."), but no population information on the Merriam's turkey populations in the Zuni Mountains area, and no information whatsoever about the plain titmouse or house wren.  Id. at 8.

The 1999 Annual Monitoring and Evaluation Report, which is dated after the challenged Decision Notice, has the most information regarding the Forest Service's monitoring of management indicator species.  AR 207.  It first generally replicates the table published in the 1998 Report, AR 207 at 3, and then gives more detail in a subsequent section, id. at 8-9.  However, the population data for mule deer and elk is simply a repetition of what was provided in the 1998 Report and again there is no population information about Merriam's turkey within the Zuni Mountains.  Id. at 8.  While the 1999 Report includes the plain titmouse and the house wren in its analysis, the population trend information for these species is extrapolated from habitat trend information.  E.g., id. ("Plain Titmouse - The population trend for this species is likely stable due to the steady state of piñon/juniper and oak habitat . . . ."; "House Wren - . . . The trend for this species and its habitat is slightly upward.").  The 1999 Report, in fact, candidly admits: "Monitoring of the management indicator species showed variances between districts and has been sporadic and anecdotal.  Assumptions are often made on the basis of habitat condition, without actual observation of the MIS of concern."  Id.[11]

Although not specifically discussed by the Forest Service, the 1985 Forest Plan EIS does offer numerical population data for elk, mule deer, and Merriam's turkey in the Mt. Taylor Ranger District.  AR 2 at 90-91.  However, the EIS notes that the population of the plain titmouse and

---

[11] The absence of population data for management indicator species is justified as follows: "Of course, monitoring of habitat is easier and cheaper because the habitat doesn't move.  Furthermore, long-term habitat trends are probably more reliable indicators of management than presence or absence of wildlife species.  Plant and animal populations can fluctuate widely in response to a number of factors that may not be remotely related to our management activities. Most of the population trends noted were related to habitat quality/quantity trends, which are the result of past management on the districts."  AR 207 at 8.  But see, e.g., AR 98 at 1 ("Good ecosystem management would be impossible without some knowledge of the extant wildlife.  One may have hypothetical bird lists for different habitats, but the actual situation in the field very seldom matches up.").

house wren are "unknown." Id. at 91. The Forest Service's 1999 McGaffey Timber Sale EA, cited by the Forest Service, focuses on habitat trend data and analysis for each of the project area's five management indicator species, giving only summary, descriptive population data for the three game species. AR 186 at 19-21, 27-30.

Finally, the Forest Service's argument that it considered the effects of each of the McGaffey project alternatives on the project area's management indicator species, especially the effect on each species' habitat, misses the point. The effects analysis not only failed to demonstrate that population inventory data had been considered, but it also failed to include population data for all five species  Consequently, although the analysis may have been sufficient in some respects, such as habitat trends, it was legally, if not scientifically, inadequate as a whole.

The Administrative Record reflects that, before rendering the McGaffey Timber Sale decision, the Forest Service did not acquire and evaluate population data (both actual and trend), beyond that extrapolated from habitat trend analyses, for all five management indicator species in the McGaffey project area. Even assuming that the evidence supports a finding that the Forest Service acquired and evaluated population data for the mule deer, elk, and Merriam's turkey management indicator species, there is insufficient evidence in the Administrative Record that it acquired and/or considered population data for the plain titmouse and house wren.

### III. CONCLUSION

The Forest Service's decision approving the McGaffey Timber Sale failed to evaluate population trend data for the project area's five management indicator species, as required by the National Forest Management Act, the Act's implementing regulations, and the Cibola Forest Plan.

Therefore, the decision was not in accordance with law and must be reversed.

**IT IS THEREFORE ORDERED** that Plaintiffs' <u>Olenhouse</u> Motion for Reversal of Decision to Authorize the McGaffey Timber Sale on the Cibola National Forest, filed March 12, 2001, [Doc. No. 18], is GRANTED.

_____
CHIEF UNITED STATES DISTRICT JUDGE

Counsel for Plaintiffs: Steven Sugarman, BELIN & SUGARMAN, Santa Fe. N.M.

Counsel for Defendant:  John W. Zavitz, U.S. ATTORNEY'S OFFICE, Albuquerque, N.M.; Andrew A. Smith, U.S. DEPARTMENT OF JUSTICE, Albuquerque, N.M.; and Lois J. Schiffer, U.S. DEPARTMENT OF JUSTICE, Washington, D.C.